**UNITED STATES BANKRUPTCY COURT**          <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                                            Chapter 11

AZUL S.A., *et al.*,                                              Case No. 25-11176 (SHL)

                                  Debtors.                        (Jointly Administered)
-----------------------------------------------------------------x

## MODIFIED BENCH RULING AND ORDER GRANTING CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF <u>REORGANIZATION OF AZUL S.A. AND ITS DEBTOR AFFILIATES</u>

**A P P E A R A N C E S :**

**DAVIS POLK & WARDWELL LLP**
*Counsel for the Debtors*
450 Lexington Avenue
New York, New York 10017
By:    Timothy E. Graulich, Esq.
       Richard J. Steinberg, Esq.
       Jarret Erickson, Esq.
       Marc J. Tobak, Esq.

**TOGUT SEGAL & SEGAL LLP.**
*Co-Counsel for Debtors*
One Pennsylvania Plaza, Suite 3335
New York, New York 10019
By:    Frank Oswald, Esq.

**WILKIE FARR & GALLAGHER LLP**
*Counsel for Official Committee of Unsecured Creditors*
787 7th Avenue
New York, New York 10019
By:    Todd M. Goren, Esq.
       Brett H. Miller, Esq.
       Joseph Brandt, Esq.

**PILLSBURY WINTHROP SHAW PITTMAN**
*Counsel for Aercap Ireland*
31W W 52nd Street, 29th Fl
New York, New York 10019
By:    Michael Burke, Esq.

**FAEGRE DRINKER BIDDLE & REATH LLP**
*Counsel for U.S. Bank Trust Company, N.A.*
1177 6th Ave 43rd Fl
New York, New York 10019
By:    Laura E. Appleby, Esq.
       Nicholas A. Argentieri, Esq.

**OFFICE OF THE UNITED STATES TRUSTEE**
*United States Trustee*
1 Bowling Green
New York, New York 10004
By:    Daniel Rudewicz, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Joint Chapter 11 Plan of Reorganization* [ECF No. 1031] (as

amended, the "Plan") of the above-captioned debtors (collectively, the "Debtors").  The sole

objection to the Plan has been filed by the Office of the United States Trustee (the "UST").  *See*

*Objection of the United States Trustee to the Debtors' Motion to Approve the (I) Adequacy of*

*Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of*

*Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With*

*Respect Thereto* [ECF No. 786] (the "UST DS Objection"); *see also Objection of the United*

*States Trustee to Confirmation of the Joint Chapter 11 Plan of Reorganization of Azul S.A. and*

*its Debtor Affiliates* [ECF No. 984] (the "UST Objection") (reaffirming UST DS Objection).[1]  At

the confirmation hearing, the Court found that the Plan satisfied all the requirements for

confirmation and overruled the UST Objection, explaining that it would provide a decision to

explain its reasoning.  This is that decision.[2]

---

[1]      The Court notes that for purposes of this Modified Bench Ruling, any terms that are not defined shall have
the meaning provided in the Plan or the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Joint
Chapter 11 Plan of Reorganization of Azul S.A. and its Debtor Affiliates and (II) Response to Objections Thereto*
[ECF No. 1007] (the "Debtors' Confirmation Brief").

[2]      This written decision memorializes the Court's bench ruling that was read into the record on December 19,
2025.  While the substance of the decision remains the same, edits have been made for ease of comprehension and

**BACKGROUND**

On May 28, 2025, Debtor Azul S.A. and its nineteen jointly administered related entities

filed for relief under Chapter 11 of the Bankruptcy Code. *Voluntary Petition for Non-Individuals*

*Filing for Bankruptcy* [ECF No. 1]; *see Order Directing Joint Administration of Chapter 11*

*Cases* [ECF No. 41]. At the time of filing, the Debtors operated the largest airline serving Brazil.

*Declaration of Fabio Barros Franco De Campos in Support of the Chapter 11 Proceedings and*

*First Day Pleadings* ¶ 3 [ECF No. 8] (the "De Campos Declaration"). The Debtors filed this

petition after taking on substantial debt as a result of the long-term effects of the COVID-19

pandemic, volatility in the foreign exchange rates, and a worldwide supply chain failure of

aircraft and engine manufacturers. De Campos Decl. ¶¶ 6, 8. Through bankruptcy, the Debtors

hoped to right size their fleet and infuse new capital through restructuring support agreements

with existing equity holders, strategic partners, and the major aircraft lessor. De Campos Decl.

¶¶ 8-10. The UST appointed the official committee of unsecured creditors in mid-June 2025 (the

"Committee"). *Notice of Appointment of Official Committee of Unsecured Creditors* [ECF No.

80].

The Debtors filed their initial plan and disclosure statement on September 16, 2025, and

has since filed several amended versions reflecting settlements with the Committee and to

address objections raised by the UST. *Joint Chapter 11 Plan of Reorganization of Azul S.A. and*

*its Debtor Affiliates* [ECF No. 602]; *Second Amended Joint Chapter 11 Plan of Reorganization of*

*Azul S.A. and its Debtor Affiliates* [ECF No. 1031]; *see Disclosure Statement for the Chapter 11*

*Plan of Reorganization of Azul S.A. and its Debtor Affiliates* [ECF No. 603]; *Amended*

---

for the sake of accuracy of citation. None of the changes in any way affects the factual or legal grounds for the
Court's ruling. Because of its origins as a bench ruling, this decision has a more conversational tone than a
traditional written decision.

*Disclosure Statement of Azul S.A. and its Debtor Affiliates* [ECF No. 832]; *Amended Disclosure Statement of Azul S.A. and its Debtor Affiliates* [ECF No. 845] (collectively, as amended, the "Disclosure Statement"); *see also* UST DS Objection. The Debtors have also filed additional plan supplements summarizing other various Plan components. *Notice of Filing of Plan Supplement* [ECF No. 919]; *Notice of Filing of Second Plan Supplement* [ECF No. 921]; *Notice of Filing of Third Plan Supplement* [ECF No. 1025]; *Notice of Filing Fourth Plan Supplement* [ECF No. 1034]. The Court approved the Disclosure Statement in early November 2025. *Order Approving the (I) Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [ECF No. 847] (the "DS Order").

In its current Plan, the Debtors propose to distribute $4.8B toward the payment of claims from twelve classes and eliminate $2B in debt. *See* Plan Art. III. Under the Plan, all Debtor-in-Possession ("DIP") Facility claims, administrative expense claims, professional fee claims, and priority claims will be paid in full. Plan Art. III; *see also* Amended Disclosure Statement at 6-12 [ECF No. 845]. Unsecured claim holders in Class 6 will be given the choice between electing to receive a pro rata share of its interests in the General Unsecured Creditor's Trust ("GUC Trust") or to a pro rata share of $20M in cash; the Plan provides that the cash recovery is the default option if unsecured creditors do not timely elect the GUC trust recovery. Plan § 3.2(f); *see also* Plan at 22 (definition of "GUC Trust Election"). The Debtors will fund the GUC Trust up to $5M for administrative expenses, and creditors will receive up to 5.5% in diluted equity of the reorganized Debtors and up to $6.5M in cash from 2027 to 2029 given certain conditions precedent. Plan at 22-23 (defining "GUC Trust Assets," "GUC Trust Cash," "GUC Trust Fees and Expenses," and "GUC Warrants."). The limited recovery under the Chapter 11 Plan for

unsecured creditors of up to 2.1% is greater than that available under a Chapter 7 liquidation, under which only the DIP Facility Claims and secured creditors would receive a distribution. *Declaration of Christopher Creger in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Azul S.A. and its Debtor Affiliates* ¶ 10 [ECF No. 1009].

There is overwhelming support for the Plan based on the voting. The Debtors report the following results:

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | 29 | 0 | $416,201,198 | $0.00 | Accepts |
| | | 100% | 0% | 100% | 0% | |
| 4 | 1L Claims | 132 | 0 | 1,048,006,408 | $0.00 | Accepts |
| | | 100% | 0% | 100% | 0% | |
| 5 | 2L Notes Claims | 99 | 8 | $311,887,399 | $20,762,318 | Accepts |
| | | 92.52% | 7.48% | 93.76% | 6.24% | |
| 6 | General Unsecured Claims | 140 | 9 | $2,386,601,538 | $172,666,379 | Accepts |
| | | 93.96% | 6.04% | 93.25% | 6.75% | |
| 7 | Unsecured Convenience Class Claims | 184 | 10 | 717,850,218 | $42,418,319 | Accepts |
| | | 94.85% | 5.15% | 94.42% | 5.58% | |

*See Declaration of Angela Tsai of Stretto, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Azul S.A. and its Debtor Affiliates* [ECF No. 997]; *Supplemental Declaration of Angela Tsai of Stretto, Inc. Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Azul S.A. and its Debtor Affiliates* [ECF No. 1033] (the "Supplemental Voting Declaration"). The Debtors received over 90% of ballots in each class, with the exception of the Unsecured Convenience Class Claims in Class 7, which only returned about 7% of their ballots. Supp. Voting Decl., Ex. 1.

Of particular relevance to the issues raised by the UST, the "Releasing Parties" under the Plan grant a release of all claims of liability, with certain limited reservations, to "Released Parties." *See* Plan § 8.6; *see also* Plan at 31 (definitions of "Released Party" and "Releasing

Party").  Every "Holder of a Claim or Interest" received a ballot that included the option to opt-out of granting a release of claims to the Released Parties (the "Opt-Out Provision").  *See* Plan at 31; *see also* Debtors' Conf. Brf. ¶ 13.  The Debtors seek third-party releases for claims against the following parties:

> (a) the Debtors; (b) the Reorganized Debtors; (c) each DIP Debtholder; (d) each Backstop Commitment Party; (e) each Strategic Partner; (f) each Agent/Trustee; (g) each Distribution Agent; (h) the Creditors' Committee and its members (including any ex-officio members); (i) the Secured Ad Hoc Group and its members; (j) AerCap; (k) each Significant Shareholder; (l) the GUC Trustee; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), such Entity's Related Parties.

Plan at 31.  Initially, the Debtors proposed that these releases would be granted by all parties that failed to return a ballot with the Opt-Out Provision selected.  *See Joint Chapter 11 Plan of Reorganization* at 27 (definition of "Releasing Party") [ECF No. 602].  Under the initial Plan, therefore, parties who did not return a ballot would have been deemed to consent to a third-party release.  *See id.*

At the hearing on adequacy of the Disclosure Statement, the Court raised concerns over the form of ballots.  *See* Hr'g Tr. dated Nov. 4, 2025, 48:14-19 [ECF No. 863] (the "November 4 Transcript").  Specifically, the Court raised the concern that the inclusion of the term "Optional" on the non-voting ballot Opt-Out Provision might mislead creditors.  November 4 Transcript 48:14-49:6; *see also Motion of Debtors to Approve the (I) Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto*, Ex. 3 [ECF No. 604] (the "DS Motion").  Further, the Court highlighted that the Opt-Out "box" should be re-located next to the text explanation of release of claims, in order to prevent creditors from overlooking the Opt-Out Provision.  November 4 Transcript 49:7-50:2; *see also* DS Motion, Ex.

2A and 2B.  Finally, the Court recommended including an additional explanation to creditors that the ballots contain additional considerations outside of voting to accept or reject the Plan, including notice of the decision to opt-out.  November 4 Transcript 50:18-25.  The Debtors accepted and adopted all of these changes to the ballots and created an explanatory cover letter to include with the ballots.  *See* DS Order, Exs. 2, 3, & 11.

The ballots with the Opt-Out Provision were served along with solicitation materials on November 5, 2025.  *See Affidavit of Service* [ECF No. 867].  In light of the voting results, which featured robust voting in all by one class, the Debtors amended their request for a third-party release.  More specifically, the Debtors amended the Plan so that the release is only granted if the voter returns a ballot and does not opt out; no releases are granted by voters who do not return a ballot.  *See* Plan at 31 (definition of "Releasing Parties").  Further, due to the low vote return of the Convenience Class Claims in Class 7, the Debtors are no longer requesting a release for members of Class 7 regardless of whether a ballot was returned.  Debtors' Conf. Brf, at 17 n.14; Hr'g Tr. dated Dec. 11, 2025, 22:4-23:15 [ECF No. 1039] (the "December 11 Transcript").  Out of the over 3,000 ballots sent to their classes, the Debtors received 767 opt-out elections.  Supp. Voting Decl., Ex. 1.

On December 4, 2025, the UST filed its objection to confirmation, echoing prior arguments that it raised at the hearing on the adequacy of the Debtors' Disclosure Statement. UST DS Objection; *see also* UST Objection.  As of the confirmation hearing, the UST had three remaining objections.[3]

---

[3]    The UST also raised two other objections which were resolved prior to confirmation: an objection over the Debtors' proposed Management Incentive Plan, and an objection regarding the scope of the Debtors' releases and adequacy of disclosure.  December 11 Transcript 19:11-20:7.

First, the UST argues the Plan's exculpation of parties is overbroad to the extent it includes parties who are not fiduciaries of the estate in violation of Section 1125 of the Bankruptcy Code.  UST DS Objection at 9; UST Obj. at 2 n.3.  The UST also argues that the Plan's exculpation improperly extends to parties who "reasonably rely on the advice of counsel" because that would purportedly provide an unjustifiable "absolute bar against liability." UST DS Objection at 12; *see also* December 11 Transcript 30:1-31:10.  Second, the UST objects that the opt-out provisions of the plan impermissibly impose a third party release on parties who have not unambiguously consented to granting such releases, thus violating the Supreme Court decision in *Harrington v. Purdue Pharma*.  *See* UST DS Objection at 13.  Third, the UST contends that the Plan's payment of Indenture Trustee expenses must satisfy the substantial contribution standard for administrative expenses in Section 503(b) of the Bankruptcy Code.  Relatedly, the UST argues that such a payment impermissibly impairs all general unsecured creditors in the class who are not receiving the benefit of the payment of such expenses.  UST Objection at 4 n.6 (citing 11 U.S.C. § 1123(a)(4)).

## DISCUSSION

## I.    Exculpation

The UST argues that the exculpation provision contained in Section 8.9 of the Debtors' Plan (the "Exculpation Provision") should not be approved for two reasons.  *See* UST DS Objection at 9; UST Objection at 2 n.3 (stating that "[t]he revised version of the Plan did not resolve the Plan-related objections set forth in the Disclosure Statement Objection, including that . . . the Plan's Exculpation Provision is overly broad. . . .").  First, the UST objects that the parties covered under the Exculpation Provision are not limited to estate fiduciaries.  *See* UST

8

DS Objection at 9.  Second, the UST objects because the language of the Exculpation Provision

permits the exculpated parties to rely on the advice of counsel.  *See id.*

Section 8.9 of the Plan[4] provides for the exculpation of the "Exculpated Parties" for

claims related to "any act or omission in connection with, related to, or arising out of" the

Debtors' Chapter 11 cases and certain related transactions.  Plan § 8.9.  The Plan defines

"Exculpated Party" as

> collectively, and in each case in its capacity as such: (a) the Debtors and
> Reorganized Debtors; (b) the Debtors' current and former officers, directors, and
> managers; (c) the DIP Debtholders; (d) the DIP Trustee; (e) the Creditors'
> Committee and its members (including any ex-officio members); (f) the Backstop
> Commitment Parties; (g) the Strategic Partners; (h) AerCap; (i) the Secured Ad
> Hoc Group and its members; (j) the GUC Trustee; and (k) with respect to each of
> the foregoing clauses (a) through (j), to the fullest extent permitted by law, such

---

[4]    Section 8.9 of the Plan provides that

Pursuant to sections 1123(b) and 105(a) of the Bankruptcy Code, to the fullest extent permitted by
applicable law, and except as otherwise specifically provided for in this Plan or Confirmation
Order, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated
Party is released, discharged, and exculpated from any Cause of Action for any claim related to,
any act or omission in connection with, related to, or arising out of the Chapter 11 Cases, the
formulation, preparation, marketing, dissemination, negotiation, filing, or pursuit of approval,
confirmation, or consummation of the DIP Facility, the DIP Documents, the RSAs, this Plan
(including the Plan Supplement and other Plan Documents), the Disclosure Statement, the Exit
Debt Facilities, the Exit Debt Documents, the GUC Warrant Documents, the GUC CVR
Documents, the GUC Trust Agreement, the Equity Rights Offering, the ERO Documents, the
Additional Investment Documents (if any), the Backstop Commitment Agreement, the Strategics
Investment Agreements, any settlement, contract, instrument, release, or other agreement or
document created or entered into in connection therewith or in the Chapter 11 Cases, and any other
act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Cases,
the reorganization of the Debtors, or the administration of, or property to be distributed under, this
Plan (including the issuance and distribution of any interests (including the New Equity Interests)
issued or to be issued under or in connection with this Plan), except for claims related to any act or
omission that is determined in a Final Order to have constituted actual fraud, willful misconduct,
gross negligence, or a criminal act; provided, however, that (i) the scope of claims subject to
exculpation pursuant to this Section 8.9 is temporally limited to claims arising during the period
between the commencement of the Chapter 11 Cases and the Effective Date, (ii) each Exculpated
Party shall be entitled to reasonably rely upon the advice of counsel concerning its duties and
responsibilities pursuant to, or in connection with, this Plan, to the extent permitted by and under
applicable law, and (iii) the foregoing exculpation shall not be deemed to release, affect, or limit
any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated
Parties with respect to, any of the Exculpated Parties' post-Effective Date obligations or covenants
arising pursuant to this Plan, the Confirmation Order, or any contracts, instruments, releases, or
other agreements or documents delivered or that survive under or in connection with this Plan.

Plan § 8.9.

>Person's Related Parties, solely with respect to work performed on behalf of the
>applicable Related Party in connection with the negotiation, execution, and
>implementation of any transactions approved by the Bankruptcy Court in the
>Chapter 11 Cases.

Plan § 1.1.  Importantly, as stated in the language above, the Exculpation Provision covers so

called "Related Parties"—as defined in Section 1.1 of the Plan—"solely with respect to work

performed on behalf of the applicable Related Party in connection with the negotiation,

execution, and implementation of any transactions approved by the Bankruptcy Court in the

Chapter 11 Cases."  *Id.*[5]  The Exculpation Provision carves out "claims related to any act or

omission that is determined in a Final Order to have constituted actual fraud, willful misconduct,

gross negligence, or a criminal act. . . ."  *Id.*  Additionally, the scope of the provision is

temporally limited to claims arising during the period between commencement of the Debtors'

bankruptcy cases and the Effective Date of the Plan.  *See id.*

The UST asserts that the Exculpation Provision is overly broad because the definition of

"Exculpated Parties" includes parties that are not estate fiduciaries.  *See* UST DS Objection at 9.

Relying on case law from outside this jurisdiction, the UST argues that exculpatory language

may only apply to "court-supervised estate fiduciaries who have performed services during a

---

[5]      The Plan defines "Related Parties" as

>with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and
>former Affiliates, and such Entity's and such Affiliates' current and former directors, board
>observers, managers, officers, committee members, members of any governing body, equity
>holders (regardless of whether such interests are held directly or indirectly), affiliated investment
>funds or investment vehicles, managed accounts or funds (including any beneficial holders for the
>account of whom such funds are managed), predecessors, participants, successors, assigns,
>subsidiaries, partners, limited partners, general partners, principals, members, management
>companies, fund advisors or managers, employees, agents, trustees, advisory board members,
>financial advisors, attorneys (including any other attorneys or professionals retained by any
>current or former director or manager in his or her capacity as director or manager of an Entity),
>accountants, investment bankers, actuaries, consultants, representatives, and other professionals
>and advisors and any such person's or Entity's respective heirs, executors, estates, and nominees.

Plan at 31.

Chapter 11 case prior to plan confirmation." UST DS Objection at 9; *see also* UST Objection at 4 & n.7 (requesting that "the Court limit the list of Exculpated Parties to Debtors and those specifically identified parties that acted as estate fiduciaries in these chapter 11 cases."). But case law in this jurisdiction, including from this Court, has already concluded otherwise.

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. Holdco, LLC,* 660 B.R. 439, 527 (Bankr. S.D.N.Y. 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019)). As such, they play an important role in the bankruptcy process. "As a policy matter, exculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in [C]hapter 11 cases." *In re Alpha Nat. Res., Inc.,* 556 B.R. 249, 260–61 (Bankr. E.D. Va. 2016). Indeed, they "give[] a certain measure of finality to the interested parties and their professionals, and assure[] them they will not be second-guessed and hounded by meritless claims following the conclusion of the bankruptcy case." *Id.* at 261 (citing *In re Chemtura Corp.*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) ("[E]xculpation provisions are included so frequently in [C]hapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decision makers in the [C]hapter 11 case.")).[6]

---

[6]      *See also Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020) (noting that in bankruptcy proceedings, parties "battle each other tirelessly [and] oxes [sic] are gored" and that the exculpation clause at issue allowed these parties "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings"); *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011); *American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012-2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 273 (2015) (the policy justification behind exculpation provisions includes "encouraging parties to engage in the process and assist the debtor in achieving a confirmable plan—actions that committees, committee members, other estate representatives and their professionals, and certain parties (such as key lenders) may not be willing to undertake in the face of litigation risk").

In this Circuit, courts have generally concluded that "[p]arties who made substantial contributions to the reorganization process and whose inclusion in the exculpation provision was a critical component in forming a plan have been found to be entitled to exculpation." *In re Genesis*, 660 B.R. at 529 (citing *In re Stearns Holdings, LLC*, 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019); *In re Klaynberg*, 2023 WL 5426748, at *17 (Bankr. S.D.N.Y. Aug. 21, 2023); *In re WorldCom, Inc.*, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (finding it appropriate to bargain for inclusion in an exculpation provision in order to reach a consensual plan)). In *Genesis*, this Court observed that "[i]t is well established in this district that, under the proper circumstances, exculpation is not limited to estate fiduciaries." 660 B.R. at 528. This Court in *Genesis* cited to *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019), which explained that:

> a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions. If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations.

*Id*. at 721. This Court also cited to *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022), which noted that exculpation may cover parties who are not estate fiduciaries when those parties have played significant roles in the case that justify such treatment:

> Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision. They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases. In the absence of gross negligence or intentional wrongdoing on their parts, the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries, to bar claims against them as set forth in the Exculpation clause, and based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court.

*Id*.

For these same reasons, the Court finds that the Exculpation Provision in the Plan is appropriate. The Exculpation Provision here is included to protect the Exculpated Parties that are involved in the Debtors' cases and the restructuring transactions that underpin the Debtors' reorganization, which the Court is approving under the Plan. As to the estate fiduciaries, the record establishes that they have exercised, and continue to exercise, their fiduciary duties to the Debtors and the Debtors' estates, including through assisting with, advising on, overseeing, and authorizing various facets of the Debtors' restructuring, and have done so with care, loyalty, good faith, and diligence. *Declaration of Beau Roy in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Azul S.A. and Its Debtor Affiliates* ¶ 31 [ECF No. 1008]. Indeed, many of these parties have performed these tasks while also overseeing the Debtors' businesses and operations during the Debtors' cases. *Id.* The Exculpated Parties that are not fiduciaries of the Debtors' estates include the DIP Debtholders, the DIP Trustee, the Backstop Commitment Parties, the Strategic Partners, AerCap, the Secured Ad Hoc Group and its members, and the GUC Trustee. *See id.* These are parties that have also made material contributions to the Debtors' cases, including by formulating, preparing, negotiating, pursing, and executing confirmation or consummation of the Plan, the DIP Facility, and the DIP Documents, the RSAs, the Exit Debt Facilities and Exit Debt Documents, the GUC Trust documents, the Equity Rights Offering and the ERO Documents, and the Strategic Investment Agreements. *Id.* For these individuals, the Exculpation Provision was a bargained-for term in exchange of their supporting the Plan. *See id.* These Court-approved transactions form the basis of the restructuring and without these parties' support and contribution, it would not have been possible for the Debtors to propose the Plan. *See id.* The Court finds that these parties have made a substantial contribution to the Debtors' reorganization and their inclusion in the Exculpation Provision was a

critical component in formulating the Plan.  Their inclusion in the Exculpation Provision is therefore appropriate in this case.

The Court also notes that the Debtors included language in the Exculpation Provision that tethers the exculpation of Related Parties to their activities in the case.  Specifically, Related Parties are exculpated "solely with respect to work performed on behalf of the applicable Related Party in connection with the negotiation, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases."  Plan at 31.  Additionally, the scope of the provision is temporally limited to claims arising during the period between commencement of the Debtors' bankruptcy cases and the Effective Date of the Plan.  Plan § 8.9.  Indeed, case law in this jurisdiction has approved exculpation provisions that apply to conduct that takes place subsequent to the Effective Date when it relates to actions approved by the Court or taken to administer a confirmed plan.  *See, e.g., In re Genesis*, 660 B.R. at 528 (noting that "exculpation may be appropriate even for actions taken after the effective date"); *In re Ditech Holding Corp.*, 2021 WL 3716398, at *9 (Bankr. S.D.N.Y. Aug. 20, 2021) ("The Exculpation Provision expressly covers acts falling under the 'administration of the Plan'—which by definition occurs post-Effective Date."); *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 132–38 (Bankr. S.D.N.Y. 2023) (overruling objection of the UST that the exculpation provision should not apply in connection with post-emergence plan distributions required by the confirmation order—and stating that such positions were "unreasonable and wrong").

The second issue raised by the UST on the Exculpation Provision is its complaint that the provision affirmatively shields Exculpated Parties that rely upon the advice of counsel.  Specifically, the Exculpation Provision contains the proviso that: "each Exculpated Party shall be entitled to reasonably rely upon the advice of counsel concerning its duties and responsibilities

pursuant to, or in connection with, this Plan, to the extent permitted by and under applicable law.

. . .” Plan § 8.9.  The UST objects to the extent that this language grants automatic protection

based on purported reliance on legal advice.  The UST argues that reliance on counsel's advice is

a good faith defense to be raised by a defendant to a claim or legal action and not an absolute bar

against any kind of liability.  *See* UST DS Objection at 12.

But this type of language is commonly included in confirmed plans in this jurisdiction.

*See*, *e.g.*, *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y. May

31, 2024) [ECF No. 1736] (confirming plan with exculpation provision that stated exculpated

parties may rely upon advice of counsel); *In re LATAM Airlines Group S.A.*, Case No. 20-11254

(JLG) (Bankr. S.D.N.Y. June 18, 2022) [ECF No. 5754] (same); *In re Avianca Holdings S.A.*,

Case No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) [ECF No. 2300] (same).  To the extent

that overbreadth might have been an issue, the Debtors modified the Exculpation Provision

following the hearing on the Disclosure Statement to provide that the Exculpated Parties may

only reasonably rely on the advice of counsel "to the extent permitted by and under applicable

law." Plan § 8.9.  This adequately resolves the UST's concern that the language should not serve

as an absolute bar against liability and the Court approves this language as revised.

## II.    Third Party Releases

In *Harrington v. Purdue Pharma*, the Supreme Court held that the Bankruptcy Code does

not authorize a nonconsensual release of a creditor's claim against a non-debtor.  *See Harrington*

*v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024).  While holding that nonconsensual third-party

releases are not permissible, the Supreme Court in *Purdue* made it clear that *consensual* third-

party releases were not the subject of its decision.  As the Supreme Court explained, "[n]othing

in what we have said should be construed to call into question *consensual* third-party releases

offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual releases at issue here." *Id.* at 226 (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)).

The Court recently examined the permissibility of opt-out provisions in the aftermath of *Purdue*.  In *Spirit Airlines*, this court examined several factors to determine of whether a proposed opt-out mechanism is appropriate.  *In re Spirit Airlines, Inc.*, 668 B.R. 689, 704-05 (Bankr. S.D.N.Y. 2025).  Drawing on decisions from other courts, the Court in *Spirit* identified the following factors:

- whether the releases were provided with a "clear and prominent explanation of the [opt-out] procedure[;]"
- whether the proposed releasing parties have any economic disincentive to follow the bankruptcy case;
- the procedural history of the case and whether the proposed release has been clearly and consistently presented to affected creditors;
- other general principals of contract law.

*In re Spirit*, 668 B.R. at 704-05 (citations omitted).

The *Spirit* decision further noted that many courts in this Circuit and elsewhere have found third-party releases through the use of opt-outs to be consensual—and permissible—under bankruptcy law after careful consideration of the circumstances within each case.  *See Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021); *see also In re Spirit*, 668 B.R. at 705 (collecting cases).  The decision also noted, however, that other courts had reached a contrary view.  S*ee, e.g., In re Smallhold, Inc.*, 665 B.R. 704, 723-724 (Bankr. D. Del. 2024) (examining third party releases post-*Purdue*); *In re Spirit*, 668 B.R. 689, 711-712 (collecting cases).

Most recently, the United States District Court for the Southern District of New York, in *In re Gol Linhas Aereas Inteligentes S.A.*, determined that the opt-out provisions contained in the plan in that bankruptcy case constituted a non-consensual release of claims against third parties

16

in violation of *Purdue*. 2025 WL 3456675 (S.D.N.Y. Dec. 1, 2025). The *Gol* court found, under

both New York state and federal contract law, that consent cannot be inferred by a creditor's

failure to opt-out of granting a third-party release. *See id*. at * 5.

Analyzing the dispute in the present case in light of all this authority, the Court concludes

that the third-party releases using an opt-out here are permissible. In short, the use of the opt-out

here is permissible because the Debtors amended the Plan to provide that the releases are

provided only by creditors that both returned a ballot and did not elect to opt-out. This

conclusion is the same regardless of whether one applies federal or state law because the only

releases granted here are for those creditors who took the affirmative step of returning a ballot

but did not check the box for an opt out.

As this Court stated in *Spirit*, "there is ample authority for the proposition that voting in

favor of a plan that contains a third-party release provision constitutes consent to the release. *In

re Spirit*, 668 B.R. at 709 n.22 (citing *In re Chassix Holdings, Inc.,* 533 B.R. 64, 79-80 (Bankr.

S.D.N.Y. 2015) (collecting cases and finding that a vote in favor of the plan was consent to the

release in the plan absent evidence of coercion); *In re SunEdison, Inc.*, 576 B.R. 453, 457-58,

460 (Bankr. S.D.N.Y. 2017) (noting that the plan provided for the release of holders of claims

who voted in favor of the plan and citing cases holding the same)). Other cases have held that

voting on a plan, either to accept or reject, constitutes consent to releases. *See In re Smallhold*,

665 B.R. at 710, 717-25 (finding that creditors who voted on the plan—regardless of how they

voted—were deemed to consent to the third party release in the plan and that parties that did not

have the opportunity to vote on the plan could not have consented to the third party release,

notwithstanding the ability to opt out). And this case avoids the difficulty associated with

instances where a creditor could only vote on the plan without an opportunity to be heard on the

release question.  As *Spirit* noted, "it is preferable to offer creditors a separate and distinct

opportunity to opt out of a third-party release contained in a plan regardless of how that creditor

voted on the plan" and that is exactly what was done in the circumstances of this case.  *In re*

*Spirit*, 668 B.R. at 709 n.22 (citing *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), Hr'g

Tr. dated November 8, 2018 46:3-21, 73:14-74 [ECF No. 783] (favorably noting at the

confirmation hearing that the opt-out mechanism was separate from a vote on the plan, thus

allowing a creditor to support the plan while nonetheless still reserving its rights as to any

proposed release of a claim against third parties)); *see also In re Lavie Care Ctrs.*, 2024 WL

4988600 at *11, *16-17 (Bankr. N.D. Ga. Dec. 5, 2024) (agreeing with the "overwhelming

majority of cases that find that a creditor's vote to accept a plan containing a third-party release .

. . makes the release consensual").

And even assuming that state law controls with respect to this issue consistent with the

guidance of the *Gol* court, the Court finds that the Plan complies with state law regarding

consent.  The Restatement of Contracts—which has been relied upon by the UST and is

referenced by the *Gol* court as authority for the applicable state law—recognizes that silence

and/or inaction may constitute consent in certain circumstances.  *See In re Spirit,* 668 B.R. at

717.  "[W]hile '[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of

action or inaction or impose on him a duty to speak,' . . . the Restatement specifically identifies

three circumstances where silence and inaction will operate as an acceptance[.]"  *Id.*  (quoting

Restatement (Second) of Contracts Section 69, cmt. a (1981)).

Of particular note here, the second exception in the Restatement provides that "silence

and inaction will constitute acceptance of an offer when 'the offeror has stated or given the

offeree reason to understand that assent may be manifested by silence or inaction, and the offeree

in remaining silent and inactive intends to accept the offer.'" *In re Spirit*, 668 B.R. at 719

(quoting Restatement (Second) of Contracts § 69(1)(b)). "[T]he case for acceptance is strongest

when the reliance is definite and substantial or *when the intent to accept is objectively manifested*

*though not communicated to the offeror*." Restatement (Second) of Contracts, § 69 cmt.

c (emphasis added); *cf. Manigault v. Macy's E., LLC*, 318 F. App'x 6, 8 (2d Cir. 2009) ("A

contract may be formed by words *or by conduct that demonstrate the parties' mutual assent*.")

(emphasis added) (citing *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448

F.3d 573, 582 (2d Cir. 2006); *Maas v. Cornell Univ.*, 94 N.Y. 2d 87, 93-94 (1999)).

In this case, the creditors providing the releases have been given reason to understand

that assent may be manifested by silence or inaction, and that in remaining silent and inactive

they intend to accept the offer. *See In re Spirit*, 668 B.R. at 719. Creditors that returned a ballot

but did not check the opt-out box have "clearly manifested their consent." *Id.* at 719-20; *see also*

*id*. at 709 (stating that "those parties have manifested their intent by taking the affirmative act of

voting on the Plan while declining to exercise the opt-out"). They were adequately informed by

the Plan, the Disclosure Statement, and the ballots that they could choose to grant the releases by

returning the ballot and declining to check the box to opt-out. *See id.* at 720. By electing to

return a ballot and electing *not* to check the opt-out box, voting creditors manifested their intent

to grant the releases through an affirmative act. *See id.* It does not matter whether such a

creditor voted to accept or to reject the Plan because "an active choice was made in each

circumstance to return the ballot without checking the opt-out box." *Id.*

The Debtors here received hundreds of such opt-outs from creditors that submitted

ballots, demonstrating that this mechanism worked properly.[7] *See In re Teligent, Inc.*, 282 B.R.

---

[7]      A high proportion of creditors in Classes 1, 4, 5, and 6 participated in voting with more than 90% of
ballots in each of these classes being returned. In total, the Debtors received 767 opt-out elections through ballots

765, 771-72 (Bankr. S.D.N.Y. 2002) ("The duty to speak need not be purely legal, but may be

based on principles of ethics and good faith.") (citing *Columbia Broad. Sys. v. Stokely-Van

Camp, Inc.*, 522 F.2d 369, 378 (2d Cir. 1975) (discussing New York law of estoppel); *In re

Ellison Assocs.*, 63 B.R. 756, 765 (S.D.N.Y. 1983) (discussing estoppel by silence)); *see

also Friedman v. Schwartz*, 2011 WL 6329853, at *5 (E.D.N.Y. Dec. 16, 2011) ("New York

recognizes that '[w]hen a party is under a duty to speak, or when his failure to speak is

inconsistent with honest dealings and misleads another, then his silence may be deemed to be

acquiescence.'") (quoting *Tanenbaum Textile Co., Inc. v. Schlanger*, 287 N.Y. 400, 404 (1942)).

Indeed, "[b]ankruptcies . . . give rise to unique moral and ethical concerns because each

creditor's action may affect the rights of every party in interest."  *In re Teligent*, 282 B.R. at 772.

Consistent with the Restatement, New York case law provides that inaction under

appropriate circumstances may manifest acceptance.  As an example, New York courts have held

that offerees agree to the terms of an offer of payment when they retain the payment, regardless

of whether or not they actually communicate their acceptance to the offeror.  *See Josephine and

Anthony Corp. v. Horwitz*, 396 N.Y.S.2d 53, 54 (2d Dep't 1977) (holding that party accepted

settlement offer when it cashed a check that was attached to offer and subsequent checks

tendered pursuant to the settlement, despite not explicitly responding to the offer and noting that

when "plaintiffs cashed the checks, an acceptance of the renewed offer was indicated by their

conduct"); *Karpen v. Ali*, 9 N.Y.S.3d 593 (N.Y. Sup. Ct. 2015) (plaintiff consented to contract

modification when he made a payment but did not explicitly agree to new terms).  New York law

has also found acceptance of an offer when an offeree takes the offered benefit, regardless of the

---

and Opt-Out Forms.  Given that only approximately 7% of ballots were returned in Class 7—and other factors
explained on the record— the Debtors withdrew their request for any third party release as to Class 7.

offeree's subjective intent.  *See Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (1st

Dep't 2004) (plaintiff consented to arbitration provision in credit card terms by failing to opt out

and continuing to use her credit cards, and was bound by the provision even though she didn't

read it); *see also Nirvana Int'l, Inc. v. ADT Sec. Servs., Inc.*, 881 F. Supp. 2d 556, 561 (S.D.N.Y.

2012), *aff'd*, 525 F. App'x 12 (2d Cir. 2013) ("It is standard contract doctrine that when a benefit

is offered subject to stated conditions, and the offeree makes a decision to take the benefit with

knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which

accordingly become binding on the offeree.") (internal citation omitted).

Finally, the Court notes that several of the other factors in *Spirit* support the result here.

The Court finds that "clarity and prominence of the language used for the release" was adequate

in this case.  *In re Spirit*, 668 B.R. at 704-05.  The language of the releases is clearly worded and

prominently presented in all of the Plan materials, including the court-approved ballots, court-

approved physical Opt-Out Forms, and on the online balloting portal.  Neither the UST nor any

other party has suggested that these materials were anything but clear.  *See id.* at 707 ("[N]o

party . . . has argued that the language and presentation here was anything other than clear and

fulsome.").  Indeed, at the hearing on approval of the Disclosure Statement, the Court requested

changes to the solicitation materials to ensure that the releases were prominently and clearly

displayed both on the ballots and the rest of the Plan materials.  Specifically, the Debtors revised

the ballots to ensure that the check-box used to manifest consent to, or to opt-out from, the

releases was immediately adjacent to the full text of the releases, ensuring that creditors

evaluating their election had immediate access to the full scope of information necessary to

understand what they would release or retain through that election.  *See* DS Order, Exs. 2A–C;

November 4 Transcript 49:18–50:2.  The Debtors also revised the cover letter to the ballots,

highlighting that the ballot required creditors to consider two items: (1) voting on the Plan, and

(2) whether to grant or withhold the releases.  *See* DS Order, Ex. 11; November 4 Transcript

50:8–23.  The Disclosure Statement, ballots, Notice of Non-Voting Status (including the Opt-Out

Form), and Confirmation Hearing Notice contained the full text of the releases and clearly and

repeatedly explained creditors' rights, including with respect to the releases, as well the various

voting mechanisms through which to demonstrate consent.  *See* Disclosure Statement; DS

Order, Exs. 2A–C, 3, 5.  The Plan Summary explained in clear terms that creditors should "read

the provisions contained in Article VIII of the Plan very carefully" to understand how

confirmation may impact the creditors and their claims and allow them to vote accordingly.

Disclosure Statement at 15.

　　In addition, the Court has examined "the procedural history of the bankruptcy case and

whether the requested release has been clearly and consistently presented to the affected

creditors." *In re Spirit*, 668 B.R. at 705.  Importantly, the Court finds that the releases have not

meaningfully changed since first proposed in September 2025 and that the releases have been

clearly and consistently presented since the beginning of the bankruptcy.  The releases were

included in the first version of the Plan filed on September 16, 2025 [ECF No. 602], and the first

and second amended versions filed more recently [ECF Nos. 831, 844].  There have not been any

changes to the releases that "might serve to confuse any party," *In re Spirit*, 668 B.R. at 707, as

there have been no changes to the releases since the disclosure statement hearing other than the

narrowing of the scope of creditors that may grant the releases.  Notice was not compromised by

last-minute changes or inconsistent or obscure language and presentation.  Nor has the UST or

any other party suggested that the presentation of the releases was anything but clear and consistent.[8]

### III.   <u>Indenture Trustee Expenses</u>

For its third objection, the UST contests the payment of the expenses of the Indenture Trustee.  The UST argues that the payment of these expenses cannot be done without satisfying the requirement of substantial contribution under Section 503(b).  *See* 11 U.S.C. § 503(b) (permitting the payment of administrative expenses when a party has made a "substantial contribution").  The UST also argues that the proposed payment would violate the requirement to treat all creditors in a particular class the same under Section 1123(a)(4) of the Bankruptcy Code.

As a threshold matter, the Court notes that the UST arguments as to payment of the Indenture Trustee expenses were presented only in a footnote in the UST Objection.  *See* UST Objection at 4 n.6.  It is well established that arguments that appear in footnotes generally are deemed to have been waived.  *See In re Crude Oil Commodity Litig.*, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) (citing *City of Syracuse v. Onondaga Cnty.,* 464 F.3d 297, 308 (2d Cir. 2006)); *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 550 n.4 (E.D. Pa. 2012) (argument pressed in a footnote is waived, in part because "the complexities of [the issue] require briefing and factual development for [the court] to make an informed ruling on this argument"); *Harris v. Kashi Sales, LLC*, 609 F. Supp. 3d 633, 642 (N.D. Ill. 2022) (finding waiver of undeveloped arguments made in footnotes is well-established) (citing various Seventh Circuit cases).

But moving on to the merits of the UST arguments, the Court rejects the UST's position. To understand the issues raised by the UST, some background is necessary.  That background

---

[8]    Of course, the Court recognizes that the modest recovery to unsecured creditors is a factor that weighs against approval of the releases here.  *In re Spirit*, 668 B.R. at 704-05.  That factor no doubt influenced the Debtors to withdraw their request for a release for any party that had not returned a ballot in these cases.

was provided at the confirmation hearing with a proffer of testimony from David Diaz of U.S. Bank, which serves as the Indenture Trustee here.   *See* Hr'g Tr. December 12, 2025, 25:17-34:6 [ECF No. 1083] (the "December 12 Transcript"); *id.* at 34:17-48:4 (additional testimony of Mr. Diaz in response to questioning).   In connection with obtaining needed financing, the Debtors entered into numerous indentures beginning in June 15, 2021.   These indentures or "trust indenture[s]" are contracts "entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer."   *Upic & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 450 n.2 (S.D.N.Y. 1992) (citing William J. Bratton, Jr., *The Interpretation of Contracts Governing Corporate Debt Relationships*, 5 Cardozo L. Rev. 371 (1984)).   The trustee, referred to as an indenture trustee, derives its duties and powers from the terms of the indenture.   *See Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir. 1985); *Fleet Nat'l Bank v. Trans World Airlines, Inc.*, 767 F. Supp. 510, 513 (S.D.N.Y. 1991) ("It is axiomatic that the powers of an indenture trustee are limited to those specifically articulated in the indentures themselves."). "The role of an indenture trustee differs from that of an ordinary trustee because the indenture trustee must consider the interests of the issuer as well as the investors, and because its obligations are defined primarily by the indenture rather than by the common law of trusts." *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) (citing Martin D. Sklar, *The Corporate Indenture Trustee: Genuine Fiduciary or Mere Stakeholder?*, 106 Banking L.J. 42 (1989)).

In June 2025, U.S. Bank entered into an agreement with the Debtors under which U.S. Bank was appointed as the successor indenture trustee in connection with several indentures and notes beginning with an indenture issued in June 2021.   December 12 Transcript 25:25-28:1.

This agreement was necessary following the resignation of UMB Bank N.A., which had resigned as indenture trustee for its respective indentures. December 12 Transcript 30:10-13. In connection with its duties under these indentures, U.S. Bank as Indenture Trustee undertook numerous efforts, such as participating in the negotiation and formulation of restructuring transactions, contributing to the development of a global settlement embodied in the Plan, and coordinating extensively with other major stakeholder groups to facilitate consensual resolutions of complex issues. December 12 Transcript 32:6-34:4; *see also* Debtors' Conf. Brf. ¶ 112 (noting that Indenture Trustee has acted for the benefit of their bondholder constituencies by engaging in many aspects of the Debtors' bankruptcy cases).

The indentures here provide a legal right for recovery of the expenses of the Indenture Trustee. *See* December 12 Transcript 29:13-17. Section 7.07(b) of each indenture also provides that the Debtors shall indemnify the Indenture Trustee for all losses, damages, claims, liability, or expenses incurred in connection with its duties as the Indenture Trustee. December 12 Transcript 28:14-22. Furthermore, Section 7.07(d) of the indentures provides for a charging lien on behalf of Indenture Trustee on all money and property collected by the Indenture Trustee, which effectively entitles the Indenture Trustee to be repaid for its fees and expenses before any funds are distributed to its noteholders. December 12 Transcript 29:4-17. The charging lien and the Indenture Trustee expenses are referenced in each of the 30 proofs of claim filed by the Indenture Trustee in these cases. December 12 Transcript 30:19-31:15. There is no evidence in the record here that the Indenture Trustee can recover its expenses except through its charging liens or by seeking recovery against the Debtors.

To further fill out the factual picture here, it is undisputed that the Debtors are required to have an indenture trustee. December 12 Transcript 61:2-13. Thus, if U.S. Bank resigned from

the position—as a prior indenture trustee has already done—the Debtors would be required to find a new party to serve in that role.  In addition, the Debtors need an indenture trustee to perform various services after confirmation of the plan and before the Effective Date, including effectuating various transactions in connection with the GUC Trust that are contemplated by the Plan and coordinating with the Depository Trust Company.  Plan at 58.

Recognizing the legal rights possessed by the Indenture Trustee as to payment of its expenses and the fact that Indenture Trustee is needed to perform various services going forward in these cases, the Debtors—along with the Committee and the Indenture Trustee—included a provision in the global settlement that the Indenture Trustee expenses would be paid through the GUC Trust.  This settlement also would permit the holders of notes—and other unsecured creditors—in Class 6 electing into the GUC Trust to receive an in-kind distribution in exchange for the cancelling of notes issued under the applicable indentures, effectively terminating the charging liens.  December 12 Transcript 33:1-9.  Importantly, an unsecured creditor in Class 6 who wishes to recover under the GUC Trust must affirmatively opt-in to this option; without such an affirmative election, all unsecured creditors will instead recover under the all cash option.  Plan at 22.

Having fleshed out the relevant background, the Court returns to the UST's argument.  The UST relies on *In re Lehman Bros. Holdings, Inc.*, for the proposition that Section 503(b) is the exclusive avenue for payment of administrative expenses.  508 B.R. 283, 289 (S.D.N.Y. 2014).  But the Court disagrees that *Lehman* controls here.  Unlike in *Lehman*, the justification for the Indenture Trustee expenses here is not rooted in its role as a Committee member.  *See* 11 U.S.C. § 503(b).  Rather, the Indenture Trustee expenses are grounded in the Indenture Trustee's legal rights under the indentures.  Said another way, the applicable contractual provisions of the

indentures provide a right of recovery against the Debtors as to these expenses while the

charging lien gives the Indenture Trustee the legal right to payment of these expenses before any

distributions on the notes are made to noteholders who are unsecured creditors in this case.

December 12 Transcript 28:14-29:17.

The Court finds Judge Wiles' reasoning in *In re Aegean Marine Petroleum Network Inc.*,

Case No. 18-13374 to be highly persuasive. As explained by Judge Wiles:

> [The indenture trustees] are not seeking payments of their fees and expenses just because
> they're committee members. And they're not seeking to make an end run around the
> changes that were made in the code to kind of stop the automatic payment of committee
> members' fees and expenses. And the indenture[] trustees are people who have
> contractual rights to the payment of their fees and expenses. . . . I don't think it's an
> evasion of Section 503(b)(4) for parties to make a commercial agreement to honor a
> contractual obligation when doing so is not a subterfuge but instead has a real benefit to
> the Debtors in the sense that they don't have to find somebody else to do this job. They
> can just use who's there right now. So to me, the issue in *Lehman* was somebody was
> evading the only statutory way that they could have gotten the fees that they wanted. I
> just don't see that here.

Hr'g Tr. dated April 1, 2019, at 35:18-25, 36:5-13 [Case No. 18-13374, ECF No. 563].[9]

Having decided that the payment of these expenses is appropriate, the question is whether

the manner of their payment somehow makes them objectionable. The payment here is part of

an overall settlement embodied in the Plan. The settlement provides that each holder of an

allowed general unsecured claim in Class 6 may elect treatment that is either (a) the holder's pro

rata share of interests in the GUC Trust or (b) the holder's pro rata share of $20 million in cash,

with no election resulting in the cash treatment by default. Plan at 22, 49-50. The settlement

provides unsecured creditors in these Chapter 11 cases with a meaningful recovery when there

was concern that no recovery might occur. *See Third Revised Disclosure Statement for the Joint*

---

[9]   Parenthetically, the Court also notes that Section 503 could not address the payment of all the expenses
here because the expenses here are not just administrative expenses during the course of the bankruptcy but also
include pre-petition expenses and even expenses that will occur after confirmation for services leading up to the
Effective Date.

*Chapter 11 Plan of Reorganization of Azul S.A. and Its Debtor Affiliates*, Appendix F [ECF No. 845] (the "Committee Recommendation Letter"). According to both the Debtors and the Committee—and unchallenged by the UST—this settlement resolves numerous complex issues that, if litigated, would impose significant cost on the Debtors' estates and potentially jeopardize recoveries by unsecured creditors. *See, e.g.*, Debtors' Conf. Brf. at ¶ 22. In addition to the question of whether the unsecured creditors would obtain a recovery in these cases, the issues subject to potential litigation include the contractual right of the Indenture Trustee to be paid for their services, both prior and subsequent to confirmation, under the indentures. *See In re Stearns*, 607 B.R. at 793 ("[W]here consideration is paid pursuant to a settlement, the Court need not review such payment under [S]ection 503(b) of the Bankruptcy Code.") (citing *In re Charter Communications, Inc.*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009)). And as previously discussed, this right to payment originates from the indentures themselves, giving the Indenture Trustee leverage in settlement discussions to insist on a clear road for payment of its expenses if the estate wished to have the benefit of the Indenture Trustee's services going forward rather than having the Indenture Trustee exercise its right to resign. Thus, this settlement also ensures that the Debtors will not have to incur the costs and expenses associated with obtaining a new indenture trustee as required by the indentures if U.S. Bank resigned as Indenture Trustee due to nonpayment of its expenses. December 12 Transcript 66:14-17. The settlement also resolves any potential objection to the Plan by the Indenture Trustee to the payment of unsecured noteholder creditors before the Indenture Trustee expenses had been paid.

Notably, the UST does not challenge the benefits of the settlement, which the Court concludes easily satisfies the requirements of Bankruptcy Rule 9019 and applicable law. *See In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (approving settlement under Rule

9019 framework as part of plan of reorganization); *In re AMR Corp.*, 502 B.R. 23, 42-43 (Bankr.

S.D.N.Y. 2013); *cf. In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016)

(noting that "[c]ompromises are a normal part of the process of reorganization").  The UST

nonetheless argues that the payment here violates Section 1123(a)(4).  That Section provides that

a plan must "provide the same treatment for each claim or interest of a particular class, unless the

holder of a particular claim or interest agrees to a less favorable treatment of such particular

claim or interest."  11 U.S.C. § 1123(a)(4)) (quoted in *In re AMR Corp.*, 562 B.R. 20, 33 (Bankr.

S.D.N.Y. 2016)).  "While disparate treatment within a class is permitted if the holder of a claim or

interest agrees to less favorable treatment, a plan in such circumstances must explicitly provide

that particular creditors are being treated in this manner so as to put such creditors on notice."  *In

re AMR,* 562 B.R. at 33-34 (citing *Forklift LP Corp. v. iS3C, Inc.* (*In re Forklift LP Corp.*), 363

B.R. 388, 398 (Bankr. D. Del. 2007)).  The crux of the UST's argument is that the Indenture

Trustee expenses only benefit "*certain* general unsecured creditors but will [] be borne by *all*

general unsecured creditors" in violation of Section 1123(a)(4).  UST Objection at 4 n.6

(emphasis in original).

     But the Court disagrees.  As expressly laid out in the Plan, only the general unsecured

creditors in Class 6 that elect the GUC Trust option over the default cash treatment will be

responsible for the Indenture Trustee expenses.  Plan at 22, 37, 50.  Put differently, only those

unsecured creditors that affirmatively consent to participate in the GUC Trust will bear the cost

of associated Indenture Trustee expenses.  *Id.*  By making such an election, those creditors have

decided that such treatment is the preferred option for them.  Because Section 1123(a)(4)

expressly permits holders of claims to agree to less favorable treatment—here such treatment

includes payment of the Indenture Trustee expenses and a pro rata share of the GUC Trust's net

assets over the cash treatment—and only those creditors that elect into the GUC Trust are responsible for the Indenture Trustee expenses, the Court rejects the UST's contention that the Plan violates Section 1123(a)(4).  Indeed, concerns about the potential unfair treatment of unsecured creditors under the settlement appear particularly unfounded given that no party contests that recovery for unsecured creditors under the settlement is superior when compared to the Plan without the settlement.  *See, e.g.*, December 12 Transcript 57:13-19.  Not surprisingly then, no unsecured creditor has objected to the payment of these Indenture Trustee expenses out of the GUC Trust.

<u>**CONCLUSION**</u>

In conclusion, the Court overrules the objection of the UST as to the Plan for the reasons stated above.  Consistent with prior discussions that occurred with the parties, the Court has already approved the confirmation order, which was entered on December 19, 2025.  *See Findings of Fact, Conclusions of Law, and Order (I) Confirming the Joint Chapter 11 Plan of Reorganization of Azul S.A. and its Debtor Affiliates and (II) Granting Related Relief* [ECF No. 1090].

Dated:  White Plains, New York
        January 6, 2026

                                    */s/ Sean H. Lane*
                                    UNITED STATES BANKRUPTCY JUDGE